IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | NO. 08-00368 |
| GEOFFREY LONG | : | |

**MEMORANDUM AND ORDER**

**NORMA L. SHAPIRO, S.J.**                                                                December 9, 2008

A grand jury returned a four-count indictment charging one count of unlawful possession of a machine gun in violation of 18 U.S.C. § 922 (o) and three counts of unlawful possession of a firearm not registered in the National Firearm Registration and Transfer Record in violation of 26 U.S.C. § 5861 (d).  Defendant, Geoffrey Long, moved to suppress evidence obtained by law enforcement officials during a visit to his residence on August 21, 2006.  The motion will be granted in part and denied in part.

**I.      BACKGROUND**

On August 22, 2008, Long filed a motion to suppress statements and physical evidence obtained by law enforcement officials during a visit to his residence on August 21, 2006.  On November 13, 2008, the court held a suppression hearing at which Special Agent Christopher Curran of the Bureau of Alcohol, Tobacco and Firearms ("ATF") testified for the government and defendant Long testified on his own behalf.

**II.     FINDINGS OF FACT**

An ATF field division based in Miami, Florida conducted an investigation into illegal importation of machine guns into the United States by Modellblau International ("Modellblau"), a German company.  (Nov. 13, 2008 Tr. at 8, 30-31.)  The investigation revealed that Long, a

resident of Boothwyn, Pennsylvania, had received a shipment from Modellblau on September 22, 2004, but investigators did not know the contents of the package. (*Id*. at 8, 31-32, 48, 76.) Agent Curran, located in the Philadelphia ATF field office, was given information obtained by the Florida agents about the shipment for further investigation. (*Id*. at 48.) Before visiting Long for questioning, Agent Curran reviewed Long's criminal history and searched federal and state firearm registration databases; he found approximately 30 firearms registered to Long. (*Id.* at 10.) Agent Curran suspected Long had committed a crime, but did not obtain a warrant to arrest him or search his residence. (*Id*. at 32-33.)

On August 21, 2006, at approximately 10:00 a.m., Agent Curran, accompanied by Pennsylvania State Trooper John Corrigan and Pennsylvania State Police Detectives Christopher Lee and Francis Carroll, approached Long's residence. (*Id*. at 7-8, 10-11.) Trooper Corrigan wore a visible badge; all of the officers were otherwise dressed in civilian attire and not readily identifiable as law enforcement officers. (*Id*. at 12.) On approach to the residence, Agent Curran, Trooper Corrigan and Detective Carroll were armed with pistols maintained in a holstered, visible position. (*See Id*. at 12-14, 33-34, 73-74.) Detective Lee was armed with a gun, approximately 24 inches in length, visibly slung across his chest in the "ready position" and pointed downward. (*Id*. at 13, 36.)

Agent Curran and Trooper Corrigan approached the front of Long's residence while Detectives Lee and Carroll approached from the rear. (*Id*. at 12, 73-75.) The officers encountered Long repairing a vehicle in the driveway. (*Id*. at 13, 71.) Agent Curran identified himself to Long, asked if Long were armed and requested permission to search him for weapons. (*Id*. at 14, 17-18, 51.) Agent Curran performed a pat-down search and found Long unarmed.

(*Id*.)  Following the pat-down, Long was not placed under arrest, and Agent Curran testified the officers would have complied had Long asked them to leave his property at that time.  (*Id*. at 54.)

Agent Curran, questioning Long about the shipment of firearms, then asked, "Did you purchase any firearms over the Internet from an individual in Germany and have them shipped?" (*Id*. at 14-15, 76, 78.)  After approximately five to seven minutes of questioning, Long acknowledged his purchases and stated he knew the transactions were illegal.  (*Id*. at 15, 57-58, 85.)  Based on these admissions, Agent Curran believed he had the right to place Long under formal arrest, but chose not to do so.  (*Id*. at 59-60.)  Had Long asked the officers to leave after his admissions, Agent Curran testified that they would not have complied.  (*Id*. at 61.)

Agent Curran informed Long that he "was going to need to seize the firearms."  (*Id*. at 16.)  Agent Curran asked whether Long had stored the firearms inside his residence, and Long answered, "Yes."  (*Id*.)  Agent Curran asked for permission to enter the house and inspect the firearms.  (*Id*. at 16.)  Long knew the officers would discover contraband inside the house, but believed he was under arrest and his only choice was to cooperate.  (*Id*. at 79.)  The officers did not obtain written consent from Long to search his residence.  (*Id*. at 55.)

Long stated no one was inside the house and led the officers into the residence.  (*Id*. at 17.)  Upon entry, Agent Curran asked for permission to perform a protective sweep of the house to confirm that no one else was present.  (*Id*. at 17.)  Long did not object; two officers searched the house while Agent Curran remained with Long in the kitchen.  (*Id*. at 17, 19.)  Agent Curran asked to see the firearms, and Long led the officers to his bedroom on the second floor of the residence.  (*Id*. at 19.)  Long retrieved two machine guns under the bed and opened a large safe containing numerous firearms.  (*Id*. at 19-20.)  Long made several incriminating statements while

3

identifying the contraband for the officers. (*Id.* at 20-22.) The officers identified 17 firearms as contraband; Long agreed to abandon them and signed an abandonment of property form. (*Id.* at 24-26.) The officers removed the contraband firearms, but not the lawfully registered firearms and left Long's property. (*Id.* at 25, 28.) The officers were inside Long's residence for approximately two hours, and except for allowing Long to use the restroom, the officers accompanied Long at all times. (*Id.* at 62.) Long was not placed under formal arrest and was allowed to remain at home. (*Id.* at 28.) At no time was Long given the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).

### III.  DISCUSSION

Long claims he was seized and his residence searched without a warrant or probable cause in violation of the Fourth Amendment. Long argues the self-incriminating statements are inadmissable because he was not *Mirandized* and the physical evidence is inadmissible because it is the fruit of an unlawful search and seizure. The government argues the self-incriminating statements are admissible because they were not the product of a custodial interrogation, or in the alternative, they were given during a reasonable investigative detention that did not require Miranda warnings. The government argues the physical evidence is admissible because Long volunteered consent to search his residence.

#### A.  Statements Made by Long Outside the Residence

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." A confession must be voluntary to be admissible at trial. Dickerson v. United States, 530 U.S. 428, 434 (2000). Because the inherently coercive nature of a custodial interrogation undermines the voluntariness

4

of a suspect's confession, incriminating statements obtained by custodial interrogations are inadmissible unless the suspect is given the warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  <u>Dickerson</u>, 530 U.S. at 435.  "In determining whether an individual is in custody, the ultimate inquiry is: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>United States v. Leese</u>, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted).  "Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning."  <u>United States v. Willaman</u>, 437 F.3d 354, 359-360 (3d Cir. 2006).  "When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."  <u>Id.</u> at 360 (quoting <u>United States v. Czichray</u>, 378 F.3d 822, 826 (8th Cir. 2004).

      Long moves to suppress statements made shortly after Agent Curran performed a pat down search for weapons.  When an officer has reasonable suspicion a person has engaged in criminal activity, the officer may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."  <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).  Such measures are not unreasonable searches or seizures under the Fourth Amendment.  <u>Id.</u>  Upon conducting a <u>Terry</u> search, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984).  Such

questioning does not require Miranda warnings unless the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Id. (citation omitted). See Cruz v. Miller, 255 F.3d 77, 85 (2d Cir. 2001) ("We have recognized that a Terry stop may turn into custodial detention, but we seem to have placed considerable weight on whether the suspect feels free to leave, without acknowledging that in all Terry stops (and traffic stops), the suspect does not feel free to leave, at least not while the permitted (brief) questioning is occurring." (internal quotation marks and citations omitted)).

Long's statements following the Terry search were the product of a lawful investigative detention and did not require issuance of Miranda warnings. The Terry search was lawful because the officers had reasonable suspicion that Long had committed a crime based on information uncovered by the investigation performed by ATF agents in Florida. See, e.g., United States v. Hensley, 469 U.S. 221 (1985); United States v. Belle, 593 F.2d 487, 497 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."). The officers had reason to believe Long might be armed because he had registered numerous firearms with federal and state agencies.

Applying the factors set forth in United States v. Willaman, supra, the circumstances surrounding the Terry search of Long are not indicative of a custodial detention. Long was not told he was free to leave, although such instruction would have been peculiar because Long was on his own property. The location of the questioning, Long's driveway, lessened the coercive nature of the encounter. Long offered the incriminating statements after a short conversation of five to seven minutes. There is no evidence that the officers used hostile voice tones. The officers' weapons were visible, but not pointed at Long. Except for Detective Lee's long gun in

the "ready position," all weapons were maintained in a holstered position. Long's physical movement was not restrained and he voluntarily responded to questioning.

Long's self-incriminating statements outside the residence were not the product of a custodial interrogation. Because the requirements of Miranda v. Arizona, supra, do not apply, those statements are admissible and will not be suppressed.

### B. Statements Made by Long Inside the Residence

After Long admitted committing a crime outside the residence, the officers had cause to place him under formal arrest but chose not to do so. Because the officers persisted in questioning Long within his residence without issuing Miranda warnings, we must consider whether his custodial status changed after his admissions.

"For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." Willaman, 437 F.3d at 359. Here, Agent Curran testified that had Long made such a request, the officers would not have complied. The forced presence of four armed law enforcement officers sufficiently restrained Long's physical movement to render him "in custody" and triggered the requirements of Miranda. Because Long was not given Miranda warnings, all subsequent statements during the remainder of the officers' visit not volunteered but made in response to the officers' questioning, are inadmissible and will be suppressed.

### C. Physical Evidence Seized Inside Long's Residence

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures." "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "[T]he Constitution has never been construed by [the Supreme] Court to allow the police, in the absence of an emergency, to arrest a person outside his home and then take him inside for the purpose of conducting a warrantless search. On the contrary, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein." Shipley v. California, 395 U.S. 818, 820 (1969). "If a search of a house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, cf. Agnello v. United States, 269 U.S. 20, 32, not somewhere outside -- whether two blocks away, James v. Louisiana, 382 U.S. 36, twenty feet away, Shipley v. California, supra, or on the sidewalk near the front steps. Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." Vale v. Louisiana, 399 U.S. 30, 33-34 (U.S. 1970) (emphasis in original).

The Fourth Amendment does not apply to abandoned property. United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004). Property becomes *bona vacantia* once an individual disclaims ownership, and there is no reasonable expectation of privacy in such "vacant goods." Abel v. United States, 362 U.S. 217, 240 (U.S. 1960). However, the Fourth Amendment applies where abandonment is involuntary. See Fulani, 368 F.3d at 355 ("abandonment may be involuntary, and thus invalid, where it results directly from police misconduct, such as an illegal search or seizure, deceit, or, perhaps, a pattern of harassment"). See also United States v. Stephens, 206 F.3d 914, 917 (9th Cir. 2000)("An abandonment must be voluntary, and an abandonment that results from Fourth Amendment violation cannot be voluntary."); United States v. Garzon, 119

F.3d 1446, 1451 (10th Cir. 1997) ("Abandonment will not be recognized when it is the result of prior illegal police conduct.").

A person may consent to search or seizure, but consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973).  "The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989).  The voluntariness of consent is a determination of fact based on the totality of the circumstances, including the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether he was subjected to repeated and prolonged questioning.  United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994).  Consent obtained by show of force, claim of authority or from a suspect held in custody suggests the presence of coercion.  See Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807, 824 (3d Cir. 1991) ("If the party conducting the search claimed the authority to search without consent, that factor weighs against a finding of voluntary consent."); United States v. Puglisi, 790 F.2d 240, 243-44 (2d Cir. 1986) (written consent given while under arrest not voluntary).

In Willaman, for example, the defendant was suspected of possessing illegal firearms. ATF agents located defendant at a hotel and questioned him without issuing Miranda warnings. 437 F.3d at 356.  Defendant admitted possession, stating the firearm was located at his residence. Id.  The ATF agent told defendant, "they 'could do it the hard way or the easy way,' at the hotel with respect to recovering the machine gun, and showed Willaman a newspaper photo of a raid taking place . . .." Id. at 360.  Defendant agreed to cooperate:

> Willaman and the agents subsequently left the hotel in separate cars to retrieve the weapon at Willaman's residence. Once they arrived at the residence, he dug up the machine gun from the place where he had buried it, and the agents took possession of it. Nevertheless, notwithstanding Willaman's apparent criminal conduct, [the ATF agent] twice informed him that he was free to go at any time. Moreover, Willaman has acknowledged that he was not coerced or treated badly in any way by the agents at his residence.

Id. at 356. The Third Circuit, affirming denial of defendant's motion to suppress the physical evidence, held defendant "freely and voluntarily turn[ed] the machine gun over to the agents." Id. at 360.

By contrast, the circumstances presented here were more coercive. The defendant in Willaman was twice told he was free to leave, was not placed under arrest after his admission at the hotel and was allowed to drive in a separate car from the hotel to his residence. Here, Long's freedom of movement was substantially constrained before he gave consent to enter the residence. Agent Curran admitted the officers would not have complied had Long asked them to leave after his admissions in the driveway.

When Agent Curran asked for permission to enter Long's residence, Long reasonably believed his only choice was to cooperate. The officers did not attempt to obtain Long's written consent. Agent Curran, in demanding to seize the contraband, implied Long had no right to refuse. The officers remained inside Long's residence for approximately two hours and subjected him to prolonged questioning. Long's consent was the product of the officers' show of authority, not his free will. The government has not met its burden of proving that Long's consent was voluntary. If anything, the events following Long's admissions outside the residence suggest his consent was coerced, not voluntary. The presence of coercion rendered

Long's abandonment of the contraband firearms involuntary.[1]

Long's admissions outside the residence provided probable cause to arrest him and search his person, but not to search his residence without a warrant. Shipley, supra. No exigent circumstances necessitated the officers' entry into the residence. The warrantless search of Long's residence was unreasonable. Payton, supra. Long's abandonment of the contraband firearms was involuntary. The physical evidence seized during the search is inadmissible and must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963).

## IV.   CONCLUSION

Long's motion to suppress statements and physical evidence will be granted in part and denied in part. Long's admissions outside his residence are admissible because they are not the product of custodial interrogation or unreasonable seizure. Long's admissions in response to questioning inside his residence are inadmissible because they are the product of a custodial interrogation in the absence of warnings required by Miranda v. Arizona, supra. The physical evidence obtained inside Long's residence is inadmissible because it was seized during a warrantless search without Long's voluntary consent. An appropriate order will follow.

---

[1] Long's abandonment was involuntary for purposes of the Fourth Amendment. While not an issue before the court, we do not think the involuntariness of Long's abandonment entitles Long to reclaim the contraband.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | NO. 08-00368 |
| v. | : | |
| | : | |
| GEOFFREY LONG | : | HON. NORMA L. SHAPIRO |

**ORDER**

AND NOW, this 9th day of December, 2008, upon consideration of defendant's Motion to Suppress Physical Evidence and Statements (paper no. 10) and the government's response thereto, following an evidentiary hearing on November 13, 2008, it is ORDERED that the motion is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated in the attached memorandum.

    /s/ Norma L. Shapiro
    S.J.